The President
delivered the opinion of the Court.
(Agents may be cloathed either with general, or special powers.—1st, A general agent may do every thing which the principal may. Powers of this sort are not usually granted, and none such appear in the present case. I
2d. Of the second sort are agents limited as to the objects, or the business to be done, and left at large as to the mode of transacting it. | For example: Pon *31 donby was limited to the business of procuring cqpsignments of tobacco to his principals, and of loading their ships; but he might be left to his own discretion as to the mode of conducting that business.
If a particular mode is not prescribed by the original power, that which the agent may adopt, the principal may, by approving, sanctify, and give to it equal validity as if it had made a part of the original authority.
If in consequence of a notorious agency, the agent is in the habit of drawing bills, and the principal in the habit of paying them, this is such an affirmance of his power to draw, that a purchaser of his bills, has a right to expect payment of them by the principal, and if refused, he may coerce it.
These, I hold to be clear principles of law. They exclude however, the idea of collusion between the bill holder and the agent, to abuse the powers confided by the principal. Such a circumstance would defeat the bill holder in his attempt to charge the principal.
The great bulk of the trade between Great Britain and this country has been principally conducted by factorage. The ostensible object of that trade was prima facie the barter of foreign merchandise for native commodities.
Experience, however, soon proved, that money must be advanced to the planters, and this necessity introduced a custom generally practised by the factors of drawing bills upon their principals, to enable them to make those advances. The mode of doing this was various; sometimes the factor prevailed upon the planter to wait until the meeting of the merchants, at which time he would draw for as much as was necessary for his purposes; others would procure a kind of banker to advance the money as they wanted it, and take their bills at the meeting of the merchants: whilst others who could not suceeed by either of those modes were obliged to draw bills at once, to enable them, by sale of them, tQ make advances as the tobacco war, purchased.
*32 I never before heard it doubted, but that the prinwas bound to accept and pay those bills, however the factor might have misapplied the money which they produced. If any case has been otherwise determined, it must have proceeded from some proof of notice of a revocation of the factor’s power, or pf some collusion between him and the bill holder.
i Alarm of danger to the fortunes of all principals has been sounded, if this doctrine should prevail. The answer is a short one. This danger should be contemplated at the time the power is given, and not when it has been exercised, and many innocent men thereby drawn in to advance their money on the faith of an and notorious
In this case it appears, that the appellees were warned of the danger and consequences of the agency exercised by Ponsonby, so early as the fall of 1783, but they still went on.
It is unnecessary to travel over the particular correspondence between Ponsonby and his principals.'—■ Though in their answer they say that Ponsonby derived his power not from them but from Roberts their former partner, yet they not only confirm that appointment in a letter of the 12th of December, 1783, but in their circular letter of May 31st preceding, they had fixed their signatures, or firms, to the letter of Roberts, and these letters were transmitted to Ponsonby as their agent. The correspondence between Smith, and Oxley and Hancock, is very strong evidence to prove the credit which they were disposed to attach to Ponsonby’s bills, for though Smith is an interested witness, and therefore, as to facts which he may relate, is not to be regarded, yet the correspondence to which, in his deposition, he refers, speaks for itself. In his letter of September 1783, he writes, that Ponsonby had applied to him to indorse his bills on them to get money to advance to the shippers, and that he had indorsed one. In answer to this letter, they thank Smith for his assistance to Ponsonby, whose bills on “ them,” they say, “ will meet due honora general *33 expression, not confined to the particular bill which Smith had endorsed, but to Ponsonby’s bills generally. This too, was in the infancy of this agency, when PonsonbiPs power to draw was not so notorious, and an indorser was required ; but when this letter was received, and Ponsonbifs bills were uniformly paid, he acquired a credit for them, which afterwards gave them currency without an indorser. This continued without interruption till the fall of 1784, when the present bills were drawn.
It is said, that Ponsonby changed his agency from that of procuring consignments of tobacco from others, to that of purchasing this article for himself, and consigning it to his principals: which not being authorised by them, they were not bound to pay his bills drawn on that account.
This brings us to the affair of the Lady Johnson. Let it be considered as between Oxley and Hancock, and Ponsonby. On the 27th of March, 1784, they apprize him of their intention to charter a ship of 400 or 500 hogsheads, to be in the Chesapeafc about August, and wish that a cargo may by that time be procured for her.—In April, they name the ship in question, and say, she is to be at St. Mary’s by the 1st of September ; if she fail, to be at their option, on that of their agents, to accept or refuse her. “ From this early notice” (they say) “ we hope the tobacco will be ready to load her.” From these letters it appears, that he was not to wait her arrival, but to procure her loading in the mean time, and that he was also entrusted with á discretionary power of taking her up or not, in case she did not arrive in time. She arrived on the 10th of September. He did take her up, and loaded her with tobacco consigned to them, but chiefly purchased by himself, and shipped on his own account.
Upon a correct view of this transaction, it would be doubtful, were this a question merely between them and Ponsonby, whether he was not strictly within the limits of his agency : the hazard of loss bv the *34 pinchase was his, not theirs : the only difference be ing, that they thereby trusted him for their advance, instead of many ; and lost the opportunity, which that advance would have afforded, of engaging many future correspondents.
In their letter of November 30th, 1784, with full information before them, of what he had done, they seem to confirm it, but forbid its being repeated.
But let the question, as between those parties, stand as it may, in w hat light is it to be viewed as it respects the bill-holders? They found him loading this ship, as he had before loaded others ; selling bills as he had been accustomed to do, to raise money for the purposes of that business ; they purchased his bills as usual, and were not concerned in the enquiry, whether he applied that money in making advances to others ; or in purchasing tobacco to consign on his own account.
Upon the whole, we are of opinion, that Oxley and Hancock are liable to the plaintiffs, for the amount of the protested bills, with interest and such legal damages as they have been obliged to pay in consequence of such protest.(1)

 Hopkins v. Blane, 1 Call. 361. 373. Blane v. Proudfit, 2 Call. 207. 214.